IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Councilmember Jeffery Young, Jr.   :
on behalf of and as representative of   :
Council of the City of Philadelphia   :
and Strawberry Mansion Community   :
Concern   :
  :
             v.   :   No. 95 C.D. 2026
  :   Submitted: June 16, 2026
City of Philadelphia, City of   :
Philadelphia Zoning Board of   :
Adjustment, Philadelphia Housing   :
Authority, Pennrose LLC, and   :
Strawberry Mansion Housing LLC   :
  :
Appeal of: Strawberry Mansion   :
Community Concern   :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER       FILED: July 13, 2026

      Strawberry Mansion Community Concern (SMCC), a registered community organization, appeals from the Order of the Court of Common Pleas of Philadelphia County (common pleas) that upheld the Decision of the City of Philadelphia Zoning Board of Adjustment (Board) approving an affordable housing development project located at 2408-12 North 31st Street (North 31st Street Property). On appeal, SMCC argues the Board lacked jurisdiction to issue its Decision because the Philadelphia Housing Authority (Authority), Pennrose LLC, and Strawberry Mansion Housing,

LLC (together, Pennrose) (collectively, Applicants) failed to obtain Civic Design Review (CDR) in accordance with Section 14-304(5) of the Philadelphia Zoning Code (Code),[1] Title 14 of THE PHILADELPHIA CODE (2012) § 14-304(5), and challenges the Board's conclusions that Applicants established that the proposed use would not alter the essential character of the neighborhood or harm the public welfare or adjacent properties.

The Authority filed an "Application for Dismissal of Appeal" (Application to Dismiss) because SMCC did not designate the contents of the reproduced record or file a reproduced record as required by the Pennsylvania Rules of Appellate Procedure. SMCC filed a "Special Motion for Judgment Pursuant to 42 Pa.C.S. § 8340.16[2] in Opposition to Application by [the Authority] and Pennrose for $4,500,000 Security Bond" (Special Motion). In the Special Motion, SMCC seeks judgment in its favor on Applicants' request for this Court to order SMCC to pay a $4,500,000 security bond due to the potential loss of that amount in grant money by Applicants if the appeal is not timely resolved. Applicants' bond request was found in its "Application for Expedited Response and Briefing and Bond" (Application to Expedite), which this Court granted in part and denied in part on April 28, 2026. SMCC maintains that it and its members are immune from liability under the Uniform Public Expression Protection Act (Protection Act).[3]

Because the Court's ability to review this matter was not affected by SMCC's failure to designate the contents of a reproduced record or file a reproduced record,

---

[1] The Code is available at https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-286773 (last visited July 13, 2026).

[2] Section 8340.16(a) of the Uniform Public Expression Protection Act (Protection Act), provides that "[a] party may file a special motion for dismissal of or judgment on a cause of action, or part of a cause of action, based on a party's protected public expression immunity." 42 Pa.C.S. § 8340.16(a).

[3] 42 Pa.C.S. §§ 8340.11-18.

we deny the Authority's Application to Dismiss.  We affirm common pleas' Order because we discern no error or abuse of discretion in the Board's Decision granting the variances.  Therefore, we dismiss SMCC's Special Motion as moot.

## I. BACKGROUND

### A. Proceedings Before the Board

This development of the North 31st Street Property is part of a larger, scattered-site affordable housing development project that utilizes 14 parcels located throughout the Strawberry Mansion neighborhood (the Project), which would consist of 55 to 57 units.  The Philadelphia Land Bank conveyed these 14 parcels, which are vacant lots and described as distressed, blighted, or subject to "short-term dumping," to the Authority for its use and approved Applicants' efforts to obtain building permits for the Project.  (Board Decision, Findings of Fact (FOF) ¶¶ 11, 13, 15, 17-18, 30; Board Decision, Conclusion of Law (COL) ¶ 13; Reproduced Record (R.R.) at 85a, 115a-16a, 128a, 130a-31a, 137a, 142a, 145a, 166a, 430a-33a, 499a.[4])  Thus, the Authority owns the Project, which is being developed by Pennrose and will be marketed for senior housing.  (FOF ¶¶ 11, 18, 38; COL ¶¶ 13-14; R.R. at 191a.)  One goal of the Project was to ensure affordable quality units in an area where affordable housing may be an issue in the future.  (FOF ¶¶ 18, 20, 30, 47; COL ¶¶ 13-14; R.R. at 136a, 142a, 149a-50a, 430a-34a, 499a.)  The proposal for the North 31st Street Property, which is in an RSA-5 (Residential Single-Family Attached) zoning district, is to build 3 dwelling units and an 800-square-foot

---

[4] Councilmember Jeffery Young, Jr., who is technically an appellee in this appeal, filed a Reproduced Record at this docket, as well as in the docket number 360 C.D. 2026, which is his separate appeal of common pleas' Order.  Although filed by an appellee, we will refer to this record as the Reproduced Record.  *See* Pennsylvania Rule of Appellate Procedure 2156, Pa.R.A.P. 2156 (providing for an appellee to file and serve a reproduced record).  Pennrose filed a Supplemental Reproduced Record.

3

community center (Community Center).  The Community Center would consist of a seating area, a small kitchen, a bathroom, and a meeting space, and would be managed by Pennrose.  (FOF ¶ 20; R.R. at 153a.)  Community engagement in the Project began in 2019.  (R.R. at 681a.)

The Philadelphia Department of Licenses and Inspections (L&I) denied a permit for the North 31st Street Property because a use variance was needed for Multi-Family Household Living and the Community Center.  This is because there would be multiple principal uses (having both dwellings and the Community Center on the same parcel) and a dimensional variance from the minimum side yard width requirement.  (FOF ¶ 1.)  L&I determined that CDR was **not required**.  (*Id.* ¶ 6.)  Applicants appealed L&I's denial of the permit for the Project at the North 31st Street Property to the Board on April 10, 2024.  (*Id.* ¶ 4.)  SMCC was designated the coordinating Registered Community Organization (RCO) for the Project.  (*Id.* ¶ 14.)  On August 23, 2024, Applicants requested a continuance of the Board hearings that had been scheduled at that point so that all hearings on the 14 properties could be heard together, copying Councilmember Jeffery Young, Jr. and SMCC's Director Bonita Cummings (Cummings).  (*Id.* ¶ 5 n.3; R.R. at 403a.)

Applicants emailed Cummings in December 2024, requesting a meeting with Cummings about other properties.  (R.R. at 679a.)  Also included in that email were the addresses of the 14 parcels involved in the Project and a note that a hearing on those parcels was scheduled before the Board on March 12, 2025.  (*Id.*)  Applicants and Cummings had a phone call on January 27, 2025, and Applicants attempted to follow-up by email on February 4, 11, 18, 24, and 25, 2025, in order to schedule an RCO meeting.  (*Id.* at 674a-78a.)  Applicants copied Councilmember Young's Director of Development, Conlan Crosley (Crosley), on the February 11, 18, 24, and

4

25 emails. SMCC did not respond to any of Applicants' efforts. SMCC's counsel entered his appearance on March 10, 2025, and asked for a continuance of the March 12 hearing, which the Board granted in addition to rescheduling a consolidated hearing for April 22, 2025. (*Id.* at 404a, 414a-15a.) SMCC still did not schedule any community or RCO meetings on the Project.

The Board held a hearing on April 22, 2025,[5] during which it first addressed a motion by SMCC requesting that the Project be remanded to L&I for CDR because it should have been considered a unified development, not 14 separate developments. After argument, the Board denied the motion. The parties then made statements to the Board, and the Board received letters of support for the Project from State Senators Sharif Street and Vincent Hughes, State Representative Keith Harris, and Ryan Boyer of the Philadelphia Building and Construction Trades Council. (FOF ¶ 12.) Representatives from the Authority and Strawberry Mansion Community Development Corporation (Strawberry Mansion CDC) and members of the community testified in support of the Project. (*Id.* ¶¶ 15, 17.) Representatives from Applicants and the Philadelphia City Planning Commission (Commission) testified about the development itself and the funding of the Project, particularly its eligibility for a federal Low Income Housing Tax Credit. (*Id.* ¶¶ 13, 18, 20, 30.) Pennrose's representative adopted counsel's statements regarding the details of the North 31st Street Property part of the Project. Pennrose representatives testified that the Community Center was added in response to a community request for a centrally located community space, that steps would be taken to control access to the

---

[5] The Board's hearing encompassed separate appeals relating to the 14 parcels. Testimony regarding all of the Project, including introduction of letters of support and testimony in support of the Project, was intermixed with testimony related to the specific appeals of the parcels. The testimony specifically related to the North 31st Street Property appeal appears at pages 151a to 168a of the Reproduced Record.

Community Center, and about what would be done to address concerns, raised by Cummings, about loitering, safety, and noise at the Community Center. (*Id.* ¶¶ 20-22, 26-27, 32.) A representative from the Commission testified that the Commission had concluded that the Project supported its Comprehensive Plan and that the proposed variances were minor deviations from the Code that were consistent with the Code's spirit and matched the existing character of the surrounding area. (*Id.* ¶ 30.)

Councilmember Young testified that his opposition was primarily to variances sought for another parcel that was a part of the Project (the Diamond Street Property) due to the lack of a community meeting for that parcel. (*Id.* ¶¶ 43-44, 46.) Crosley acknowledged on cross-examination that Councilmember Young's office had never requested nor organized a community meeting for that Property. (R.R. at 127a.) Cummings testified on behalf of SMCC, the registered RCO, about concerns regarding the Project being comprised of rental units, rather than allowing for home ownership, and that the Community Center would be detrimental to the surrounding area. (FOF ¶ 31.) Cummings conceded on cross-examination that she had not attempted to have a community meeting. (*Id.* ¶ 40.)

The Board unanimously voted to grant the variances for the North 31st Street Property with a condition relating to commercial trash pickup for the Community Center. (*Id.* ¶ 33.) Relevant to SMCC's appeal, the Board concluded that Applicants had established that the proposed development at the North 31st Street Property would not negatively affect the public safety, health, and general welfare of the surrounding community and that it was consistent with the character of the neighborhood. (COL ¶¶ 14, 18.) Specifically, the Board stated:

> It appeared to the Board that SMCC's main concern about the overall development was the lack of homeownership opportunities. While the

6

Board certainly understands SMCC's desire to build equity for families in its community, it is the role of the [Board] to determine whether the variance criteria have been satisfied by [] Applicant[s] in the proposal before the Board. Whether dwelling units will ultimately be leased or owned is not distinguished in the use definitions under the Household Living subcategory in the Zoning Code.[] SMCC did raise concerns that the proposed [C]ommunity [C]enter would result in noise and loitering. However, [] Applicant[s] addressed these issues by requiring reservations, utilizing security measures like lighting and cameras, situating a property manager in the immediate area, and providing soundproofing between the [C]ommunity [C]enter and the residential units. The Board also required via proviso that trash be collected by a private hauler in order to prevent accumulation due to the use of the [C]ommunity [C]enter.

*(Id.* ¶ 18.)

### B. *Appeal to Common Pleas*

SMCC appealed to common pleas on May 28, 2025. After argument, common pleas denied SMCC's appeal and affirmed the Board's Decision. Upon SMCC's appeal to this Court, common pleas directed it to file a statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) (1925(b) Statement). SMCC did so, in which it challenged the Board's jurisdiction to consider Applicants' appeal from the L&I decision because no CDR occurred, and the Board's conclusion that Applicants met their burden of proof that the requested variances would not harm the public health, safety and welfare. In its Opinion pursuant to Rule 1925(a) (1925(a) Opinion), common pleas rejected SMCC's arguments as being without merit. Common pleas held that SMCC's position that CDR was required before the Board had jurisdiction over the appeal was not supported by the Code's plain language. Common pleas further held that Applicants adequately established that they met their burden of proof under the Code and addressed the public safety concerns raised by SMCC with the Community Center.

7

C. *Post-Appeal Filings with this Court*

Subsequent to SMCC's appeal, Applicants filed the Application to Expedite, seeking to have the appeal decided expeditiously and an order directing SMCC and Councilmember Young to post a security bond in the amount of $4,500,000, payable to Applicants, by July 1, 2026. The impetus for the request for the bond was that the Authority received, on March 31, 2026, written notice that $4,500,000 of the Project's funding would **expire** if not spent by the end of 2026. (Application (Appl.) to Expedite ¶¶ 3, 17, 41.) To accomplish this, Applicants maintained that construction must start by July 1, 2026, and the appeals process must be complete by that date. (*Id.* ¶¶ 46-47.) Applicants asserted that without that funding, the Project cannot be constructed. (*Id.* ¶¶ 4, 48.) According to Applicants, SMCC's appeal was without merit and was an attempt to stop the Project from occurring due to the expiration of the funding, even if it loses its appeal. (*Id.* ¶¶ 1, 60-62, 66.) Thus, Applicants asked the Court to direct SMCC and Councilmember Young to post a security bond if the appeals were not finally resolved by July 1, 2026. (*Id.* ¶ 72.)

Councilmember Young filed an answer and brief opposing the Application to Expedite and any attempt to impose a security bond in this matter, which SMCC adopted as its position. Councilmember Young contended there was no legal basis for Applicants' bond request, or for the amount of the bond request, and that the request should be denied. SMCC added that any attempt to impose a security bond would violate the Protection Act.

By Order dated April 28, 2026, this Court granted the Application to Expedite in part and denied it in part. The Court ordered the matter to be expedited, directed common pleas to file its record and 1925(a) Opinion by May 11, 2026, set an

8

expedited briefing schedule, indicated no extensions would be granted, and directed that this matter be listed for expedited consideration. The Order did not reference the request for a security bond, but that is the only part of the Application to Expedite that was not expressly granted.

Thereafter, SMCC filed its Special Motion, to which Pennrose and the Authority filed separate responses explaining why the motion should be dismissed. The Authority then filed its Application to Dismiss, to which SMCC filed no response. We first address the Application to Dismiss.

## II. THE AUTHORITY'S APPLICATION TO DISMISS

We first address the Authority's Application to Dismiss that seeks dismissal of SMCC's appeal pursuant to Pennsylvania Rule of Appellate Procedure 2188, Pa.R.A.P. 2188, which allows for an appellee to seek dismissal of an appeal where the appellant fails to file a designation of reproduced record, brief, or reproduced record in the time prescribed by the rules or court order. Here, the Authority asserts that SMCC has consistently failed to comply with the procedures before the Board and common pleas, and that SMCC's current noncompliance is another attempt to delay resolution of this matter in order to "run the clock out on [the Authority] and Pennrose's financing."[6] (Appl. To Dismiss ¶¶ 10-11.) SMCC did not file a timely answer to the Application explaining why its appeal should not be dismissed.[7]

Rule 2188 states, in pertinent part, that "[i]f an appellant fails to file his designation of reproduced record, brief or any required reproduced record within the time prescribed by these rules, or within the time as extended, an appellee may move

---

[6] Pennrose also argues that SMCC's appeal should be dismissed on this basis in its brief.

[7] By Order of this Court dated June 2, 2026, this Court directed that answers to the Special Motion and Application had to be filed by 4:00 p.m. on June 5, 2026. SMCC filed an answer after 4:00 p.m. on June 12, 2026, which does not set forth an explanation for the tardiness of its filing.

9

for dismissal of the matter." Pa.R.A.P. 2188. Pennsylvania Rules of Appellate Procedure 2154 and 2186, respectively, provide in relevant part that the appellant must "serve and file a designation of the parts of the record which he or she intends to reproduce and a brief statement of issues which he or she intends to present for review" not later than 30 days before the date the appellant's brief is due, and the reproduced record shall be filed and served no later than the date of service of the appellant's brief. Pa.R.A.P. 2154, 2186. Per Pennsylvania Rule of Appellate Procedure 2185(a), "the appellant shall serve and file appellant's brief no later than the date fixed pursuant to subdivision (b) [(relating to deferred briefing)] or within 40 days after the date on which the record is filed, if no other date is so fixed." Pa.R.A.P. 2185(a). Courts may, within their discretion, "impose sanctions for noncompliance with procedural rules[.]" *King v. City of Philadelphia*, 102 A.3d 1073, 1077 (Pa. Cmwlth. 2014) (internal quotation marks and citation omitted).

Here, the ordinary time frames related to the designation and filings were adjusted by the Court's April 28, 2026 Order granting Applicants' Application to Expedite in part, which set the time for the filing of common pleas' record as May 11, 2026, and for SMCC's brief as May 22, 2026. The April 28, 2026 Order did not give a date by which SMCC had to designate the contents of its Reproduced Record, but it would have had to occur sometime before May 22, 2026, the date on which SMCC's Reproduced Record would be due pursuant to Rule 2186.

SMCC neither filed a designation of the Reproduced Record nor did it file a Reproduced Record. Applicants maintain SMCC's appeal should be dismissed for its failure to do so. While the Court understands Applicants' frustrations, the April 28, 2026 Order did not specifically address either designating part of the Reproduced Record or directing the filing of a Reproduced Record. It stated "[SMCC] shall file

10

[its] **merits brief**[] on or before May 22, 2026." (Order, Apr. 28, 2026 at 2 (emphasis added).) Thus, arguably, this Order did not specifically prescribe a time within which those items had to be filed in this expedited matter. Moreover, common pleas electronically filed its original record, which includes the record created before the Board, thereby allowing this Court to review both the Board's Decision and common pleas' Order affirming that decision. *See Muth v. Ridgway Twp. Mun. Auth.*, 8 A.3d 1022, 1026 (Pa. Cmwlth. 2010) (denying request to dismiss an appeal under Rule 2188 due to an untimely designation of reproduced record because "the trial court supplied the original record from which this Court can conduct a meaningful review"). Although Applicants believe that the failure to comply with the Rules is intended to delay resolution, Councilmember Young did file a Reproduced Record, which aids the Court in its appellate review. The decision to sanction a party for failure to comply with procedural rules is discretionary and, exercising that discretion, we decline to dismiss SMCC's appeal under these circumstances. Accordingly, the Application to Dismiss is denied.

### III. MERITS[8]

#### A. Whether CDR was required before the Board could consider Applicants' Appeal.

SMCC first asserts the Board erred in denying SMCC's request that the matter be remanded to L&I in order for CDR to occur, which SMCC maintains is required under the Code. SMCC argues that although 14 separate applications were filed

---

[8] "Where the trial court does not take additional evidence, we are limited to determining whether the [Board] committed an error of law or manifestly abused its discretion." *Coal Gas Recovery, L.P., v. Franklin Twp. Zoning Hearing Bd.*, 944 A.2d 832, 837-38 (Pa. Cmwlth. 2008) (citation omitted). "An abuse of discretion occurs when the findings are not supported by substantial evidence in the record." *Id*. at 838 n.9 (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

11

with L&I for the Project, 1 for each parcel, the entire Project should have been considered together as a single "development" that consists of more than 50 residential housing units, which would require it to undergo CDR under Section 14-304(5) of the Code. SMCC argues the Board's contrary interpretation of this provision is not consistent with the rules of construction because it focused on one of the three definitions of "development" in the Code, thereby not giving effect to all of the Code's definitions. In short, according to SMCC, the Board did not apply the Code as written when concluding that CDR was not required. SMCC contends that, until CDR is complete, the Board could not commence its hearing because it lacked jurisdiction to consider Applicants' appeal from L&I's denial of the permit.

Pennrose asserts that CDR was not required by the Code's plain and unambiguous language. It points to the definition of "development" in Section 203(94) of the Code and to Table 14-304-2 as support of the Board's interpretation that CDR was not required here where 14 applications were submitted to L&I, none of which met the criteria for CDR. The Authority also argues that, as common pleas concluded, SMCC's arguments are "belied" by the Code's plain language, pointing to the same provisions as Pennrose. (The Authority's Br. at 10.) It also maintains that SMCC's reliance on the existence of multiple definitions of "development" is misplaced because L&I's and the Board's interpretation of the Code are entitled to deference, particularly where the two alternative definitions of development are expressly limited to the sections in which they appear.

SMCC's argument on this point requires an examination of the Code and of the interpretation of the Code by L&I and the Board. The rules of statutory construction apply to the interpretation of a zoning ordinance. *City of Clairton v. Zoning Hearing Bd. of Clairton*, 246 A.3d 890, 903 (Pa. Cmwlth. 2021). "[T]he

12

primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance." *Tri-County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 509 (Pa. Cmwlth. 2014); Section 1921 of the Statutory Construction Act of 1972 (SCA), 1 Pa.C.S. § 1921. To ascertain that intent, "we are mindful that a statute's plain language generally provides the best indication of legislative intent." *Tri-County Landfill, Inc.*, 83 A.3d at 510. In reading the plain language, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage." Section 1903(a) of the SCA, 1 Pa.C.S. § 1903(a). Where an ordinance or statute defines a term therein, the Court is bound by that definition. *Long v. Pittsburgh Zoning Bd. of Adjustment*, 336 A.3d 1090, 1095 (Pa. Cmwlth. 2025) (citation omitted). Statutes are to be construed, where possible, to give effect to all of their provisions such that no provision becomes mere surplusage. 1 Pa.C.S. § 1921(a). Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b).

As we explained in *Tri-County Landfill, Inc.*,

> if we determine the ordinance provision at issue is unambiguous, we must apply it directly as written. *Bowman v. Sunoco, Inc.*, 65 A.3d 901 ([Pa.] 2013); *see* 1 Pa.C.S. § 1921(b). However, if we deem the language of the ordinance ambiguous, we must then ascertain the legislative body's intent by statutory analysis, wherein we may consider numerous relevant factors. *Id.* An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested. *Adams Outdoor Adver*[*t*]., *L.P. v. Zoning Hearing Bd. of Smithfield Twp.,* 909 A.2d 469 (Pa. Cmwlth. 2006).

> Further, "[w]hile it is true that zoning ordinances are to be liberally construed to allow the broadest possible use of land, it is also true that zoning ordinances are to be construed in accordance with the plain and

13

ordinary meaning of their words." *Zappala Grp., Inc. v. Zoning Hearing Bd. of McCandless,* 810 A.2d 708, 710 (Pa.[ ]Cmwlth.[ ]2002)

83 A.3d at 510.

"It is well-settled that some deference must be given to the interpretation of an ordinance by the entity that is charged with administering the ordinance and that courts cannot substitute judicial discretion for administrative discretion." *Callowhill Neighborhood Ass'n v. Phila. Zoning Bd. of Adjustment*, 118 A.3d 1214, 1226 (Pa. Cmwlth. 2015); *see also* 1 Pa.C.S. § 1921(c)(8) (indicating courts may consider administrative interpretations of the language in question). "L&I, as a department of the City, [is] empowered to interpret the [Code] and formulate policy regarding how the [Code] should be implemented." *Callowhill Neighborhood Ass'n*, 118 A.3d at 1225-26 (citation omitted). "L&I is the administrative actor within the City that has the expertise in the area of zoning and, as such, possesses authoritative interpretive powers to determine which provisions of the Code are relevant to permit applications and how those provisions should be interpreted." *Id.* at 1226. "[D]eference must be given to L&I's interpretation absent proof of fraud, collusion, bad faith or abuse of power." *Id.* (internal quotation marks and citation omitted). We have also recognized that a zoning board "is the entity charged with the interpretation and application of the zoning ordinance" and its "interpretation of its own zoning ordinance is entitled to great weight and deference from a reviewing court." *Tri-County Landfill, Inc.*, 83 A.3d at 510 (citation omitted).

CDR is governed by Section 14-304(5) of the Code. Subsection (b) of this section provides, relevantly, that "[t]he civic design review procedures of this subsection apply to **any development** that meets the criteria in Table 14-304-2 (Civic Design Review Triggers)," subject to several exceptions not applicable here, and "L&I shall not issue a final decision on **an application for any development**

14

**that meets the criteria of Table 14-304-2** until review by the [CDR] Committee has been completed . . . ." CODE § 14-304(5)(b) (emphasis added). The "Board shall not commence a hearing on an application until review by the [CDR] Committee has been completed . . . ." *Id.* § 14-304(5)(b)(.1)(b). Table 14-304-2 sets forth:

| Civic Design Review is required in the following two cases: | |
| --- | --- |
| **Location of Applicant's Property** | **Covered Types of Applications** |
| **Case 1:** The applicant's property is located in any district, except as provided in § 14-304(5)(b)(.1). | **AND** *the application* includes new construction or an expansion that:<br>1.       Creates more than 100,000 sq. ft. of new gross floor area, excluding any floor area within an existing structure; or<br>2.       Creates more than 100 additional dwelling units, excluding any dwelling units within an existing structure. |
| **Case 2:** The applicant's property:<br>1.       Is located in any district except as provided in § 14-304(5)(b)(.1); and<br>2.       Affects property in any Residential district, as defined by § 14-304(5)(b)(.2) (Affected Properties). | **AND** *the application* includes new construction or an expansion that:<br>1. Creates more than 50,000 sq. ft. of new gross floor area, excluding any floor area within an existing structure; or<br>2. Creates more than 50 additional dwelling units, excluding any dwelling units within an existing structure. |

CODE, Table 14-304-2: Civic Design Review Triggers (italicized emphasis added).

SMCC maintains that CDR was required for each parcel because, if considered as a unified development, the Project in its entirety met the criteria of Table 14-304-2. L&I and the Board disagreed, concluding that CDR was not required because 14 applications were filed, 1 for each parcel, and none of the applications met the criteria for CDR. Common pleas found no error in L&I's and the Board's interpretation of Section 14-304-2, citing the Code's definition of "development." (1925(a) Op. at 14.) Specifically, common pleas reasoned:

15

> The [] Code requires CDR for "any development" that creates more than fifty additional dwelling units. [CODE,] § 14-304(5)(b)(.1)(.a)[,] Table 14-304-2. The Code defines "development"—for all purposes other than flood and steep slope protection—as "[t]he erection or relocation of a structure, an alteration to an existing structure that results in a change in gross floor area, or a lot adjustment." [CODE,] § 14-203(94)(b). The words in this definition are singular: "a structure," "an existing structure," "a lot adjustment." [*Id.*] Each of the fourteen applications forming parts of the scattered-site project before the [Board] proposed the erection of one structure on one lot. No single structure in the Project exceeded fifty units. Each application constituted a separate development under the Code's plain language, and none individually triggered CDR [].
>
> This Court declined SMCC's exhortation to read an "aggregation" concept into the statute because of its plain language. 1 Pa.C.S. § 1921(b) (unambiguous words control construction); *Chanceford Aviation Props., L.L.P. v. Chanceford Twp. Bd. of Supervisors*, 923 A.2d 1099, 1104 (Pa. 2007) (courts must apply statute according to plain text where clear and unambiguous language used). Any perceived gap in the CDR framework is for the appropriate legislative body to address, not the courts.
>
> This court, moreover, was required to defer to the [Board]'s reasonable interpretation of the ordinance it administers, as well as to L&I's interpretation as the administrative actor charged with reviewing permit application. *Callowhill Neighborhood Ass'n . . .*, 118 A.3d [at] 1226.

(*Id.*) We agree with common pleas' reasoning, and it supports upholding the conclusion that CDR was not required.

Moreover, although SMCC asserts that the interpretation is incorrect because Section 14-304(5)(a) refers to "any development" and not "any application," (SMCC's Br. at 8-9), Table 14-304-2 expressly connects CDR to "the application" filed and whether that "application" contains the required quantitative level of development, CODE, Table 14-304-2. Finally, SMCC's reliance on Sections 14-516(3)(e) and 14-533(2) of the Code is not persuasive because the terms of those

16

sections **relate only to the particular overlay districts** addressed therein.[9]  CODE §§ 14-516(3)(e) (stating that "[t]he following standards **apply to Subarea B of the West Overlay District**); 14-533(2) (stating that its definition is "[**f**]**or the purposes of this § 14-533**" which is the Mixed Income Neighborhoods Overlay District) (emphasis added).  Thus, while those sections reference broader types of "developments," those broad references relate only to those sections, not the Code as a whole.

Giving the requisite deference to the Board's and L&I's interpretation of the Code, which is consistent with the Code's plain language, we discern no error in those interpretations.  Therefore, this is not a reason to reverse common pleas' Order.

> *B. Whether Applicants established that the North 31st Street Property part of the Project would not be detrimental to the public health or alter the essential character of the neighborhood.*

SMCC argues that the Board failed to make findings of fact or conclusions to support its determination that the Project on the North 31st Street Property would not alter the essential character of the neighborhood, would not substantially and permanently impair the appropriate use of adjacent property, and would not be detrimental to public health.  The essential character of single-family zoning districts, which allows for the development of "a sense of community and a shared commitment to the common good," "stability and permanence" in who resides in

---

[9] Section 14-516(3)(e) authorizes an "Optional Unified Development Plan" the purpose of which is to "to encourage the development of multiple lots in a single plan to promote sound economic development, enhance economic vitality, and support diverse walkable neighborhoods." CODE § 14-516(3)(e)(.1).  Section 14-533(2) relates to the definition of a "Residential Housing Project" for purposes of the "MIN, Mixed Income Neighborhoods Overlay District," which includes "any development which itself, or in combination with any closely related development, involves the development of ten or more dwelling units, twenty or more sleeping units, or both, and that is located in whole or in part within the Mixed Income Neighborhoods Overlay District." CODE § 14-533(2).

17

residential districts, deserves legal protection. (SMCC's Br. at 16-17 (quoting *Albert v. Zoning Hearing Bd. of N. Abington Twp.*, 854 A.2d 401, 409 (Pa. 2004)).) SMCC contends the community's concern is that they do not want any more rental units in their neighborhood, and the Project does not afford homeownership as an option. They argue that those who testified in favor of the Project had ties with entities, including the Strawberry Mansion CDC, which financially benefit from the Project, and their testimony should not have been credited.

SMCC also contends that although the Board acknowledged generally SMCC's testimony of the impact of the Project, the Board left unaddressed SMCC's evidence of the concerns of violence arising from the existing basketball court, which is in close proximity to the proposed Community Center. According to SMCC, the development of the North 31st Street Property will alter the essential character of the neighborhood because that area is primarily a single-family residential block, and permitting the community room in close proximity to the existing basketball court will "promote[] the type of hanging out and group hanging that is a disturbance to the corridor of the block." (*Id.* at 18.) SMCC contends Applicants' evidence is insufficient to address those concerns because the Center's manager would be located a few blocks away. The lack of specific findings to support the Board's conclusions, SMCC asserts, requires either reversal or remand for the Board to meet its obligations to issue a reviewable decision.

Pennrose responds that Applicants did establish that granting the variance would not be adverse to the public interest. They point to the testimony and numerous letters supporting the Project and the North 31st Street Property part of the Project in particular, including that there was a need for community space and that this property had been vacant since 2007 and contributed to the general blight

18

of the community, which would be removed with the completion of the Project at that location. (R.R. at 116a, 128a, 130a, 154a, 165a-66a, 434a, 442a.) Pennrose also asserts Applicants presented evidence addressing SMCC's safety and loitering concerns about the Community Center, including the use of security cameras outside the Community Center, which the Board credited.[10] Finally, while Cummings testified about a preference for owner-occupied rather than rental properties, such issues are not a part of the Board's purview in deciding whether to grant a variance, but, in any event, there was testimony of those that supported the Project that quality, affordable rental housing was needed in the area and that rental properties would aid in resolving the blight issues. (*Id.* at 116a, 130a.)

The Authority argues that SMCC's arguments on these points are a challenge to the Board's giving more weight to Applicants' evidence than SMCC's evidence, but evidentiary weight determinations are for the fact finder, which is the Board. Contrary to SMCC's arguments, the Board did not fail to adequately consider SMCC's evidence; it specifically considered and addressed SMCC's two concerns (rental units and the Community Center). According to the Authority, "SMCC confuses single-family zoning with homeownership" and the "Code does not (and cannot) regulate whether a single-family home is owner-occupied or rented." (The Authority's Br. at 14.) Here, the Authority argues, there was evidence that rental units provide an affirmative public benefit by providing affordable housing and remediating longtime blight.

---

[10] Pennrose asserts SMCC's reference to gun violence in its brief, (SMCC's Br. at 19), should not be considered because the event occurred **after** the Board granted the variance and, therefore, the articles and evidence cited by SMCC's brief were not a part of the record before the Board, (Pennrose's Br. at 10 n.2). We agree that we cannot consider evidence that was not presented to the Board. *See HYK Constr. Co., Inc. v. Smithfield Township*, 8 A.3d 1009, 1016-17 (Pa. Cmwlth. 2010) (both the fact finder and appellate court may only consider evidence in the record).

19

Upon review of the record, we agree with common pleas that the Board did not err or abuse its discretion in concluding that Applicants met their burden of proof for the variances under the Code. Pursuant to Section 14-303(8)(e)(.1)(.c)-(.h) of the Code, to grant a variance, the Board must find that the variance would not endanger public health, safety, or welfare, injure adjacent properties, substantially increase congestion, adversely affect transportation or public facilities, create environmental damage, or adversely affect any adopted plan for the area. Where, as here, a use variance is requested, the applicant also has to demonstrate that the proposed use will not alter the essential character of the neighborhood or be detrimental to public welfare. CODE § 14-303(8)(e)(.2)(.c).

SMCC relies on *Metal Green*, in which the Supreme Court held that the Board's decision in that case was deficient because it "did not set forth credibility or weight of evidence determinations, and did not provide the necessary reasoning for its conclusion that the minimum variance requirement was not met" thereby "leaving the parties and reviewing tribunals largely guessing as to the basis for its determination . . . ." *Metal Green, Inc. v. City of Philadelphia*, 266 A.3d 495, 516 (Pa. 2021). "It is only with an adequate decisional foundation that the proper standard of review can be employed." *Id.* at 517. SMCC asserts that the Board's Decision is, like the one in *Metal Green*, insufficient and does not adequately address SMCC's concerns so as to allow appellate review.

SMCC's concerns relate to the Community Center and the fact that the Project consisted of rental units, rather than allowing for homeownership, and that the Board did not explain why it rejected those concerns. However, we agree with common pleas that

> the [Board] made extensive Findings of Fact and, at paragraph 18 of its Conclusions of Law, gave a cogent and fulsome explanation for why it

20

concluded [the Project at North] 31st Street would not have a negative effect on the public safety, health, and general welfare of the surrounding community. The [Board] directly addressed SMCC's concerns about the [C]ommunity [C]enter and explained why the Applicants' mitigation measures were adequate—precisely the kind of findings *Metal Green* requires. [] Cummings had raised concerns about noise and loitering. The [Board] cited to the record and noted that the Applicant[s] had addressed these concerns by: (1) requiring reservations, (2) implementing security measures, (3) hiring a property manager, (4) providing soundproofing, and (5) requiring commercial trash collection. These expansive findings met the . . . requirement[s] set forth in *Metal Green*.

(1925(a) Op at 12-13.)

Although SMCC asserts that the testimony of community support was not credible and that the Board did not adequately consider SMCC's position or evidence, the Board summarized all of the testimony before it, including Cummings' testimony opposing the Project, and explained why the evidence proffered by Applicants mitigated or addressed the specific concerns raised. SMCC may not agree with the Board's giving Applicants' evidence more weight than its own, but evidentiary weight and credibility determinations are for the Board as fact finder. *Metal Green*, 266 A.3d at 506 (stating that a zoning board, as fact finder, "determines the credibility of witnesses and weighs their testimony, resolves conflicts in testimony, and, in doing so, may accept or reject the testimony of any witness in part or *in toto*"). Moreover, SMCC's complaints about the lack of opportunity for the community to voice its concerns are unpersuasive where Applicants repeatedly contacted SMCC about having community meetings and SMCC did not schedule any, notwithstanding its designation as the RCO for this Project. Accordingly, these are not reasons to find that the Board erred in granting the variances.

As for SMCC's arguments based on its preference for units that are owner-occupied, not rented, we, again, agree with common pleas that "[t]he Board correctly

21

found the creation of home ownership opportunities is not a criterion under the []
Code's variance framework." (1925(a) Op. at 13.) The zoning district in which the
North 31st Street Property is located is a single-family residential district, but, as the
Authority points out, single-family zoning is not equivalent to homeownership. To
the extent SMCC appears to argue that the essential character of neighborhood
requires owner-occupied units, SMCC did not present evidence that the
neighborhood is mostly owner-occupied.

Moreover, as common pleas held

> [t]he record . . . contains substantial affirmative evidence of public
> benefit in support of the [Board's COL] ¶ 18 findings. The Project
> remediates long-standing blight—the [North] 31st Street Property has
> been vacant since at least 2007 and was contributing to physical
> deterioration in the neighborhood—and preserves affordable housing
> in a rapidly changing neighborhood at documented risk of market-rate
> development. . . . Five public officials, including two State Senators
> and a State Representative, submitted letters confirming the urgency of
> the need and the neighborhood's accelerating development
> pressure. . . . Broad community support was documented through
> letters, petition signatures, [and] in-person testimony from block
> captains and community members. . . . The Board found that the
> feedback from the community "consisted overwhelmingly of
> expressions of strong support" that the Project "would have a positive
> impact on the neighborhood." [(COL ¶ 19.)] The [Board's] public
> welfare finding is supported by the record and is entitled to deference.
> *Marshall* [*v. City of Philadelphia*], 97 A.3d [323,] 331 [(Pa. 2014)].

(1925(a) Op. at 13.) We agree with common pleas' assessment, and, therefore, this
is not a basis for finding that the Board erred or abused its discretion.

## IV.    SMCC's SPECIAL MOTION

In the Special Motion, SMCC seeks to have judgment entered in its favor
finding that it will not be required to pay the $4,500,000 security bond requested by
Applicants pursuant to Section 8340.16 of the Protection Act. SMCC argues, in the
Special Motion, that it is engaged in "protected public expression" through the

22

appeal and that the request that it post a security bond is a "cause of action" that unlawfully attempts to "chill the valid exercise of protected public expression." (Special Motion ¶¶ 2, 5-6, 16 (quoting Sections 8340.12(1)-(3) and 8340.15(1)-(2) of the Protection Act, 42 Pa.C.S. §§ 8340.12(1)-(3), 8340.15(1)-(2)).) Under the circumstances here, SMCC contends it enjoys immunity from the security bond request and is entitled to attorneys' fees, court costs, and litigation expenses pursuant to Sections 8340.15(l)(i) and 8340.18(a)(1) of the Protection Act, 42 Pa.C.S. §§ 8340.15(l)(i), 8340.18(a)(1). (*Id.* ¶¶ 10, 19-21.)

In their separate responses to the Special Motion, Pennrose and the Authority assert the Special Motion should be dismissed because there is no risk that SMCC will be ordered to pay the security bond. They contend this Court's April 28, 2026 Order denied the request for the posting of a security bond, and the Special Motion was filed on May 30, 2026, **after** the denial of the requested security bond.[11]

Section 8340.16(a) of the Protection Act provides that "[a] party may file a special motion for dismissal of or judgment on a cause of action, or part of a cause of action, based on a party's protected public expression immunity." 42 Pa.C.S. § 8340.16(a). SMCC contends that Applicants' request for a security bond was a cause of action against it that was based on its protected public expression and that they are immune from liability under Section 8340.15 of the Protection Act.[12]

---

[11] They both also assert merits-based reasons for why the Special Motion should be denied because, among other reasons, the Protection Act would not apply under these circumstances.

[12] Section 8340.15 provides:

A person is immune from civil liability for a cause of action based on protected public expression if any of the following paragraphs apply:

(1) The party asserting the cause of action based on protected public expression fails to:

**(Footnote continued on next page…)**

23

Having expeditiously denied SMCC's appeal and affirmed common pleas' decision upholding the Board's Decision, we dismiss the Special Motion as moot.[13]

## V. CONCLUSION

Upon careful review, we deny the Authority's Application because our review was not hindered by SMCC's failure to designate the contents of a reproduced record or to file its own reproduced record. Because we discern no error or abuse of discretion in the Board's Decision granting the variances in this matter, we affirm common pleas' Order upholding that decision.[14] Finally, having affirmed common pleas' Order, we dismiss SMCC's Special Motion as moot.

 

_____
RENÉE COHN JUBELIRER, President Judge

Judge Dumas and Judge Wolf did not participate in the consideration of this matter.

---

(i) establish a prima facie case as to each essential element of the cause of action; or

(ii) state a cause of action upon which relief can be granted.

(2) There is no genuine issue as to any material fact, and the person against whom the cause of action based on protected public expression has been asserted is entitled to judgment as a matter of law in whole or in part.

42 Pa.C.S. § 8340.15.

[13] To the extent the Court's April 28, 2026 Order may be read as not denying Applicants' bond request, as Applicants argue, that request is denied based on our expeditious resolution of this appeal. Our dismissal of the Special Motion as moot should not be read to preclude SMCC from reasserting such motion should Applicants again attempt to seek a bond.

[14] Pennrose also asserts that if the Court finds merit in SMCC's arguments, SMCC lacks standing to challenge the grant of the variance because it is not aggrieved, which it challenged before common pleas. (Pennrose's Br. at 14-20.) Common pleas denied the motion to quash SMCC's appeal. (Original Record, Item 17.) The Authority also asserts that SMCC lacks standing in its brief. (The Authority's Br. at 3.) Because of our disposition, we do not reach Pennrose's alternative reason for affirming common pleas' Order.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Councilmember Jeffery Young, Jr.                          :
on behalf of and as representative of                     :
Council of the City of Philadelphia                       :
and Strawberry Mansion Community                          :
Concern                                                   :
                                                          :
                    v.                                    :    No. 95 C.D. 2026
                                                          :
City of Philadelphia, City of                             :
Philadelphia Zoning Board of                              :
Adjustment, Philadelphia Housing                          :
Authority, Pennrose LLC, and                              :
Strawberry Mansion Housing LLC                            :
                                                          :
Appeal of:  Strawberry Mansion                            :
Community Concern                                         :

# **O R D E R**

**NOW**, July 13, 2026, the Order of the Court of Common Pleas of Philadelphia County, entered in the above-captioned case, is **AFFIRMED**. Additionally, the Philadelphia Housing Authority's (Authority) "Application for Dismissal of Appeal" is **DENIED**, and Strawberry Mansion Community Concern's "Special Motion for Judgment Pursuant to 42 Pa.C.S. § 8340.16 in Opposition to Application by [the Authority] and Pennrose for $4,500,000 Security Bond" is **DISMISSED AS MOOT**.

_____
RENÉE COHN JUBELIRER, President Judge